IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
AT KNOXVILLE

| | |
|---|---|
| **RON POPE and SANDY POPE,** ) | |
| Plaintiffs, ) | |
| ) | |
| v. ) | 3:04-cv-388 |
| ) | |
| **PHIL HOELCHER, TRADEMARK ANIMAL** ) | |
| **TALENT, TRADEMARK KENNELS, INC.,** ) | |
| **WINGS WILDLIFE PRODUCTIONS, BIRDS** ) | |
| **AND ANIMALS UNLIMITED, BIRDS AND** ) | |
| **ANIMALS OF THE UK,** ) | |
| Defendants. ) | |

## MEMORANDUM AND ORDER

Defendant, Birds and Animals Unlimited (B&AU), moves the court to enter summary judgment and to dismiss the complaint against it [ECF #27]. Plaintiffs have responded in opposition [ECF # 29], to which B&AU has replied [ECF #31]. For the reasons that follow, the motion is **GRANTED** and B&AU is **DISMISSED** from this action.

B&AU provides "character animals" for use in television shows, commercials and movies. In the summer of 2003, defendant was contacted by a film production company to provide certain dogs for a movie entitled *Resident Evil II - Apocalypse* that was being filmed in Canada. The script called for several Doberman Pincher dogs to perform various actions, including biting scenes. B&AU does not own animals for use in "biting work." Thus, it contracted with Trademark Animal Talent (TAT), as well as another company, Alvin's Animal Rentals of California, and other individual trainers, to provide

and train various dogs for the film. Phil Hoelcher (Hoelcher), owner of TAT, was specifically retained by Birds and Animals, UK (B&A-UK) to provide and train dogs for the movie based on his expertise in biting dog work and his knowledge of the "Schutzhund" form of dog training.[1] Subsequently, Hoelcher visited the home of the plaintiffs and selected two of plaintiffs' dogs, Barney and Nero, for work on the film. Hoelcher then transported the dogs to Canada. On or around August 3, 2003, Nero was found dead in his cage; it was later determined that he had died of a condition known as "bloat." On or about August 21, 2003, Barney broke free from his leash and died after being hit by a car.

Subsequent to the deaths of Barney and Nero, Gary Gero (Gero), President of both B&AU and B&A-UK, and Julie Tottman (Tottman), Operations Manager and Lead Animal Trainer of B&A-UK, on behalf of B&AU and B&A-UK, took steps to compensate the plaintiffs for the loss of their dogs. Negotiations ensued between the plaintiffs and Gero and Tottman via the telephone.[2] B&AU asserts the parties reached the following

---

[1]Schutzhund, or "sport dog" was developed in Germany and involves tracking, obedience, retrieving and protection work. It is rigorous and highly specialized. Schutzhund clubs conduct trials that test a dog's abilities in the different areas of its training program. A dog receives a Schutzhund level ranking upon successful completion of a trial. *See McDonald v. Ohio State Univ. Veterinary Hosp.*, 644 N.E.2d 750 (Ohio Ct. Cl. 1994).

[2]The court notes that B&A-UK was previously dismissed from this action because it was determined the plaintiffs had not carried their burden of establishing personal jurisdiction over that defendant. In an affidavit, a representative of B&A-UK swore that the company had not had "any contact with the State of Tennessee in connection with the specific allegations in the complaint." B&AU's motion now reveals the involvement of Gero and Tottman, preparation of the release by B&A-UK, and payment by B&A-UK to plaintiffs.

2

agreement as to compensation for the deaths of the plaintiffs' dogs: B&A-UK to pay plaintiffs $10,000 USD and one-half of the cost of a replacement dog.

On September 29, 2003, a purported "release" summarizing the above terms of the agreement between the parties was prepared by B&A-UK. Prior to the plaintiffs signing the release, Hoelcher provided them with the replacement dog. On October 1, 2003, B&AU paid TAT $2000 for its one-half cost of the replacement dog obtained by Hoelcher for the plaintiffs. On October 2, 2003, the plaintiffs affixed their signatures to the following writing:

> I know nothing will bring an end to the regret and pain you feel, but maybe this will help to end the struggle with the details. It is our understanding that Birds and Animals UK will give you $10,000 and will pay half of the cost of the dog, that you have accepted, that has been found for you in the U.S. Upon receipt of the above, you agree to release Birds and Animals UK, Birds and Animals Unlimited and all of it's [sic] officers as well as Davis/Impact films from all liability related to the use and consequences resulting from their use on the film, "Resident Evil."

Sandy Pope faxed a copy of the signed release to the attention of Tottman and Gero at B&A-UK. Her cover sheet noted that the original copy of the release had been placed in the mail. The cover sheet also provided B&A-UK with the routing information for the plaintiffs' bank account with BB&T in Knoxville, Tennessee, so that B&A-UK could wire the $10,000 to the plaintiffs. On October 6, 2003, B&A-UK wired $10,000 USD to the plaintiffs' account with BB&T, as evidenced by a "Funds Transfer - Debit Advice" from Barclays Bank.

3

At least a month after the execution of the release and acceptance of the replacement dog, Tottman was contacted by Mr. Pope and told that the replacement dog had been found unsatisfactory and that they had returned it to Butch Henderson (Henderson), the trainer from whom Hoelcher had obtained the dog. According to plaintiffs, it was suggested to them by Tottman that they obtain $4,000 from Hoelcher and conduct their own search for an acceptable dog. Tottman states she told plaintiffs she had been unable to find a replacement dog comparable to Barney and Nero for sale, but that she would keep looking and that plaintiffs should do the same and notify her if an acceptable dog was found. Plaintiffs assert that at no time did they agree to accept $4,000 from Hoelcher or to conduct their own search for an acceptable dog. They claim it is impossible to purchase a dog comparable to Barney and Nero for that amount of money.

Plaintiffs argue that the replacement dog was to be comparable to Barney and Nero and would carry high certifications in Schutzhund training just as Barney and Nero had done. According to plaintiffs, in their discussions with Hoelcher regarding the replacement dog, he had told them that the replacement dog "had all the pieces" to be a successful dog. Plaintiffs claim that in the Schutzhund-trained Doberman field, such a statement means that the dog is trained in many specific skills, but the training has not been refined such that the dog is ready to certify at any level in Schutzhund. After keeping the dog for one month however, plaintiffs claim it was apparent the replacement dog would not ever reach the titles that had been held by Barney and Nero, so they returned it to Henderson. Plaintiffs note that the replacement dog is now over two years

4

old and still has no titles or certifications despite training, whereas a dog his age comparable to Barney and Nero would have earned Schutzhund titles and certifications.

**SUMMARY JUDGMENT STANDARD**

Summary judgment is appropriate only when there is no genuine issue of material fact and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 106 S.Ct. 2548 (1986). The moving party must demonstrate to the court the absence of a genuine issue of material fact through reference to pleadings and discovery responses. *Id.* at 323. The nonmoving party must then demonstrate that a material issue of fact exists for trial. *Id.* at 324. When a court evaluates a motion for summary judgment, "the inferences [that the court draws] from the underlying facts ... must be viewed in the light most favorable to ... the party opposing the motion ...." *United States v. Diebold, Inc.*, 369 U.S. 654, 655, 82 S.Ct. 993 (1962).

The court's treatment of facts and inferences in a light favorable to the nonmoving party does not relieve that party of its obligation "to go beyond the pleadings" to oppose an otherwise properly supported motion for summary judgment under Rule 56(e). *See Celotex*, 477 U.S. at 324. The nonmoving party must oppose a proper summary judgment motion "by any of the kinds of evidentiary material listed in Rule 56(c), except the mere pleadings themselves...." *Id.* A scintilla of evidence in favor of the nonmoving party is not sufficient. There must be enough evidence that a

reasonable jury could find for the nonmoving party. *Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1477 (6th Cir. 1989).

B&AU contends that it entered into a binding release with the plaintiffs which resulted in full and total satisfaction of all claims against B&AU that the plaintiffs might otherwise have as a result of the use of plaintiffs' dogs on the film. Plaintiffs assert that the agreement was not fulfilled because the replacement dog was unacceptable. They assert that B&AU has not been released from providing a dog comparable to Barney and Nero.

In Tennessee, a release is valid and not against the public policy of the state. *Dixon v. Manier*, 545 S.W.2d 948, 950 (Tenn. App. 1976). A release is a contract, and rules of construction applied to contracts are used in construing the meaning of a release. *Richland Country Club, Inc. v. CRC Equities, Inc.*, 832 S.W.2d 554, 557 (Tenn. App. 1991). The cardinal rule is to ascertain the intent of the parties. *Id.* (citing *Bob Pearsall Motors, Inc. v. Regal Chrysler-Plymouth*, 521 S.W.2d 578 (Tenn. 1975)); *see also* 66 Am. Jur.2d *Release* § 30 (1973). "A general release covers all claims between the parties that are in existence and within their contemplation." *Richland Country Club*, 832 S.W.2d at 557 (citing *Cross v. Earls*, 517 S.W.2d 751 (Tenn. 1974)); *see also* 76 CJS *Release* § 52 (1952).

The writing at issue here contains all of the terms necessary to make the release a binding document. It states that the plaintiffs agree to release B&AU "from all liability

6

related to the use and consequences resulting from [the dogs'] use on the film." Further, the writing is supported by consideration, in that B&A-UK agreed to pay the plaintiffs $10,000 USD and to pay for half of the cost of the replacement dog. Lastly, the writing is signed by the parties. The terms and language of the release are plain and unambiguous and are not in conflict with each other. Additionally, the actions of the parties, including the plaintiffs, are consistent with the terms of the release.

The court finds it significant that the release does not contain any terms that make its effectiveness conditional on the plaintiffs receiving a "comparable" dog and subsequently being happy with the dog they received. At the time they signed the release, plaintiffs were in possession of the replacement dog that had been found by Hoelcher. Plaintiffs had to know at the time they signed the release that an untrained, uncertified, 11-month-old puppy might not be "comparable" to dogs "extremely highly trained and decorated in the Schutzhund form of training." Plaintiffs cannot simply set aside the release into which they entered because they have now determined they are not satisfied with the terms to which they agreed. Accordingly, plaintiffs are bound by the terms of the release and B&AU is **DISMISSED** from this lawsuit.

**IT IS SO ORDERED.**

**ENTER:**

  **s/Thomas W. Phillips**
**UNITED STATES DISTRICT JUDGE**